IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOSE LUIS MARTINEZ - ESQUIVEL,<br><br>Defendant. | FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER<br><br>Case No. 2:07-CR-00918DAK<br><br>Judge Dale A. Kimball |

Defendant Jose Luis Martinez-Esquivel moves to suppress all evidence obtained as a result of an allegedly unlawful search of his home and vehicle and an allegedly unlawful detention. Defendant also seeks to suppress statements that he made to police prior to Miranda warnings. The court held an evidentiary hearing on the motion on June 30, 2008. At the evidentiary hearing, Ronald J. Yengich represented Defendant, and Veda M. Travis represented Plaintiff the United States of America. Following the hearing, both parties agreed to submit their arguments to the court on the briefing and to forego closing arguments. The parties' briefing is now complete, and the court, having carefully considered the evidence and the memoranda submitted by the parties, as well as the relevant law and facts relating to the motion, renders the following Findings of Fact, Conclusions of Law, and Order.

# FINDINGS OF FACT

1. On December 6, 2007, at approximately 6 a.m., Salt Lake City Police executed a federal search warrant of Orfil Garza's home, located at 5404 West Ridgeflower in Kearns, Utah.

2. Detective Hamideh, than assigned to the Drug Enforcement Agency (DEA) Task Force, attended a debriefing prior to execution of the search warrant. At the briefing, Detective Hamideh saw a photograph of Garza and was advised that Garza was known to be armed. In connection with service of the warrant, Detective Hamideh was responsible for securing the perimeter of the Garza home.

3. The search of Garza's home yielded substantial quantities of methamphetamine and other contraband.

4. The police did not locate Garza during the search of the home. Garza's common-law-wife Maria Martinez (Garza's Wife) was at home, and the police took her into custody. Based upon both their investigation and the evidence they obtained from the search of Garza's home, the police deemed it necessary to locate and arrest Garza.

5. In an attempt to locate Garza, the police went to Defendant's home, located at 5018 West Woodacre Drive in West Jordan, Utah. Defendant was the father of Garza's Wife.

6. At approximately 8:45 a.m., Detective Hamideh conducted a knock-and-talk at Defendant's residence. No one answered the door.

7. At approximately 9 a.m., Defendant's wife, Maria Martinez (Defendant's Wife) and their other daughter, Diane Martinez, arrived at Defendant's residence.

8. Detective Hamideh approached the vehicle, parked in Defendant's driveway, that Defendant's Wife was driving.

9. Detective Hamideh speaks fluent Spanish and he began a friendly and cordial dialogue with Defendant's Wife. He asked if she lived in the home, he explained that the police were looking for Garza, and he asked if she knew Garza's whereabouts.

10. Detective Hamideh also asked Defendant's Wife if he could look inside the home to see if Garza was there. Defendant's Wife agreed. Detective Hamideh was unable to locate Garza within Defendant's home.

11. At approximately 9:05 a.m., Garza's Wife, still located at the Kearns residence, called Garza and, at the request of the DEA, asked him to come home. Based on that phone call, the police learned that Garza was purportedly riding in a yellow Avalanche truck.

12. Five minutes after receiving this information, Detective Hamideh, who was standing on the sidewalk outside Defendant's home, saw a yellow Avalanche and recognized Garza as the passenger.

13. Based on the information he had received at the briefing earlier that day that Garza would be armed, Detective Hamideh drew down on the Avalanche and, in Spanish, identified himself as a police officer.

14. Speaking in Spanish, Detective Hamideh ordered the vehicle to stop. The Avalanche stopped in front of the house. Defendant was driving. Detective Hamideh did not recognize Defendant and had received no information in the briefing regarding Defendant. He had no reason to believe that Defendant was guilty of any offense.

15. Once the Avalanche stopped, Garza exited the vehicle and the police took Garza into custody. Garza informed police that he had a gun in the vehicle. A subsequent search of the Avalanche revealed a gun located on the floor of the passenger side.

16. Special Agent Tim Chard took Defendant into custody at gunpoint.

17. The police handcuffed Defendant and placed him in the front seat of Agent Chard's vehicle. The door of the front side passenger seat remained open and Detective Hamideh stood by the open door for approximately five to ten minutes while the police dealt with Garza.

18. At some point, Detective Hamideh told Defendant why the police stopped the vehicle and asked Defendant, "Who owns the truck?" Defendant told Detective Hamideh that the truck was his, that it was part of his car business, and that he had taken the truck to sell it.

19. Detective Hamideh then asked Defendant for permission to search the Avalanche. Detective Hamideh informed Defendant that he did not have to consent to the search.

20. Defendant consented to the search of the Avalanche, stating to Detective Hamideh, "Hey, there is nothing in that truck, go ahead."

21. At the time Defendant agreed to the search, Detective Hamideh was wearing his tactical gear, his gun was visible, and other armed police officers were nearby. It was daylight, traffic on the street was not blocked off. Detective Hamideh never drew his weapon, raised his voice, or overtly threatened Defendant in any way.

22. Detective Hamideh remained at Defendant's side while the police officers searched Defendant's truck and arrested Garza.

23. In Defendant's truck, approximately fifteen minutes after the search began, the police found $330,000 in a trash bag in a manufacturer's compartment in the back of the truck.

24. When the police found the case—approximately fifteen minutes after the traffic stop began—Defendant looked shocked and said, "Hey, that's not mine."

25. Detective Hamideh confirmed with Defendant that Defendant did not own the money and asked how long Defendant had been in control of the truck. At that time, Detective Hamideh did not believe that Defendant knew anything about the money. Detective Hamideh further believed that Garza was using Defendant.

26. After Detective Hamideh and Defendant spoke about the money and the truck, Defendant complained about the hand cuffs. Detective Homideh allowed Defendant to get out of the police car long enough to hand cuff Defendant with his hands in front, attached to a belly chain.

27. Detective Hamideh then left Defendant's side to take pictures and to assist with the investigation of Garza and the vehicle.

28. Defendant's Wife and Diane Martinez exited Defendant's home and attempted to leave Defendant's residence to obtain medical attention for Defendant's Wife's diabetes. Detective Hamideh did not believe that Defendant's Wife looked seriously ill.

29. Detective Hamideh asked Defendant's Wife for permission to search the house to look for money, drugs, and anything illegal.

30. At 9:30 a.m., Defendant's Wife signed a consent form that was written in Spanish and English. Detective Hamideh translated the English portions into Spanish for Defendant's Wife. Diane Martinez witnessed the signing of the consent form by Defendant's Wife and Detective Hamideh.

31. At approximately 9:40 a.m., Agent Holmer, the case agent, arrived at the scene and took the consent form from Detective Hamideh and walked to the patrol car where Defendant was sitting. At that point in time, Defendant was wearing a belly chain and handcuffs.

32. Agent Holmer explained to Defendant in Spanish that he had been taken into custody because a search warrant had been served on Garza's home and because the police were looking for Garza.

33. Agent Holmer asked Defendant if there was some place he and Defendant could speak privately. Defendant invited Agent Holmer into his home. The two sat in Defendant's kitchen. At this point in time, Agent Holmer removed Defendant's handcuffs and belly chain. Agent Holmer then asked Defendant if he could understand Agent Holmer's Spanish.

34. Agent Holmer then told Defendant that he wanted to search Defendant's home. Agent Holmer informed Defendant that he was not under arrest and could leave at any time, could refuse consent to the search of his home, and could ask the police to leave the premises. Agent Holmer then specifically asked Defendant for permission to search Defendant's home.

35. Defendant granted consent to Agent Holmer to search his home.

36. Agent Holmer presented Defendant with the consent form that had already been signed by Defendant's Wife, Diana Martinez, and Detective Hamideh. At 9:48 a.m., Defendant signed the consent form. Agent Holmer and another police officer witnessed the signature.

37. Throughout Defendant's conversation with Agent Holmer, the agent was wearing tactical gear and carrying a weapon. Agent Holmer did not draw his weapon, did not raise his voice, and did not touch Defendant. Agent Holmer did not threaten Defendant in any way.

38. Agent Holmer remained with Defendant while the police searched Defendant's home. During that time, the two chatted. At some point, Agent Holmer stopped his questioning.

39. Upon concluding the search, the police informed Agent Holmer that they had found items in the home that could be incriminating, including a gun and pay-owe sheets.

40. Agent Holmer then advised Defendant of his Miranda rights using a card that the agent carries in his pocket. The time was approximately 11:30 a.m.

41. After being advised of his Miranda rights, Defendant agreed to speak with Agent Holmer. During the course of their conversation, Defendant made incriminating statements. Defendant informed Agent Holmer that the money in the Avalanche was not his. Defendant signed a form to that effect.

42. The form signed by Defendant was written in English and constituted a disclaimer of ownership of currency and/or property. Agent Holmer reviewed the form with Defendant, line by line, explaining the document in Spanish. In response, Defendant made certain statements. Agent Holmer wrote down these statements.

43. The police did not arrest Defendant on December 6, 2007.

44. On December 19, 2007, following his indictment by a grand jury, Defendant was taken into custody.

## CONCLUSIONS OF LAW

1. In moving to suppress evidence, the defendant has the burden of proof. *See United States v. Madrid*, 30 F.3d 1269, 1275 (10th Cir. 1994).

2. The Fourth Amendment prohibits "unreasonable . . . seizures." U.S. Const. amend. IV.

3. It is well established that "stopping an automobile and detaining its occupants constitute[s] a seizure withing the meaning of [the Fourth] Amendmen[t]." *United States v. Gama-Bastidas*, 142 F.3d 1233, 1239 (10th Cir. 1998) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)) (alterations in original) (additional quotations omitted). A stop executed in the absence of reasonable suspicion violates the Fourth Amendment. *See United States v. Alacorn-Gonzalez*, 73 F.3d 289, 292 (10th Cir. 1996).

4. To determine if a *Terry* stop, or investigative detention, constitutes an unlawful seizure, the court employs a two-part test. *See United States v. Lang*, 81 F.3d 955, 965 (10th Cir. 1996). "First, [the court] ask[s] whether the stop was justified at its inception. Second, [the court inquires as to] whether the stop was reasonably related in scope to the circumstances which justified the interference in the first place." *Id*.

5. "The government has the burden of demonstrating that the seizure it seeks to justify on the basis of reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative detention." *United States v. Shareef*, 100 F.3d 1491, 1501-02 (10th Cir. 1996) (quotations and citation omitted).

6. The United States Supreme Court has stated that "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person . . . was involved or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *United States v. Hensley*, 469 U.S. 221, 229 (1985). "[W]here police have been unable to locate a person suspected of involvement in a . . . crime, the ability to stop that person, ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to

justice." *Id*. This is particularly so "in the context of felonies or crimes involving a threat to public safety." *Id*.

7. "In determining whether an officer has reasonable suspicion, [the court] examine[s] the totality of the circumstances." *Shereef*, 100 F.3d at 1505 (additional quotations and citation omitted).

8. The court determines that the police had reasonable suspicion to believe Garza was wanted in connection with a felony crime. The police's earlier search of Garza's home yielded methamphetamine, cutting agent, and other evidence related to drug trafficking. The court also determines that the police had reasonable suspicion to believe that Garza was traveling in the Avalanche. Detective Hamideh had seen a picture of Garza earlier in the day, and Garza's Wife had described the vehicle Garza was traveling in as a yellow Avalanche. Detective Hamideh saw a yellow Avalanche approaching Defendant's residence and recognized Garza from the photograph the agent had seen earlier. Accordingly, the court concludes that the police were justified in their initial stop of the Avalanche.

9. "[T]he duration and extent of the seizure must be evaluated upon 'the circumstances which justified the interference in the first place.'" *Lang*, 81 F.3d at 966 (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). The court asks "whether the[ police's] actions are objectively reasonable under the circumstances." *Id*.

10. The Tenth Circuit has made clear that "[p]olice officers are authorized to take reasonable steps necessary to secure their safety and maintain the status quo during a [*Terry*] stop." *Gama-Bastidas*, 142 F.3d at 1240. Thus, "the use of firearms, handcuffs, and other

forceful techniques does not necessarily transform a *Terry* detention into a full custodial arrest—for which probable cause is required—when circumstances reasonably warrant such measures." *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994) (quotations omitted).

11. Because Garza informed the police that there was a gun in the vehicle, the court determines that the police were reasonable in placing Defendant, the driver of the Avalanche and Garza's traveling companion, in handcuffs and in placing him in the front seat of the Avalanche while officers searched the Avalanche and determined how to best deal with Garza. Placing Defendant in handcuffs permitted the police to maintain the status quo while determining the threat to their safety and while effectuating Garza's arrest. *See Shareef*, 100 F.3d at 1506 (holding that officers did not act unreasonably in "restrain[ing] the [occupants of a vehicle] with handcuffs until the officers had completed securing all the defendants").

12. The court also determines that the length of Defendant's detention was reasonable under the circumstances. The police detained Defendant for approximately fifteen minutes. *Cf. id*. at 1507 (stating that police detained individuals for forty-five minutes while pursuing an investigation). The degree of force—i.e., holding Defendant in handcuffs and belly chain—was also reasonable given the discovery of $300,000 in the Avalanche, the uncertainty as to whether Defendant was involved in drug trafficking, the need for all officers' involvement in the investigation, the potential for Defendant to flee, and the fact that police were awaiting the arrival of Agent Holmer, the case agent. *See United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994) (noting that the court "does not

require [police officers] to use the least intrusive means in the course of a detention, only reasonable ones").

13. Because the court determines that the police were justified in their initial stop and that the extent and duration of the seizure of Defendant was reasonable, the court concludes that no violation of Defendant's constitutional rights occurred.

14. The Fourth Amendment proscribes "unreasonable . . . searches." U.S. Const. amend. IV.

15. Courts have held that if a defendant gives his or her voluntary consent to a warrantless search, the search does not violate the Fourth Amendment. *See United States v. Ringold*, 335 F.3d 1168, 1174 (10th Cir. 2003).

16. The Tenth Circuit has determined that for a consent to search to be valid, two conditions must be satisfied: "(1) There must be a clear and positive testimony that consent was unequivocal and specific and freely given; and (2) The government must prove consent was given without duress or coercion, express or implied." *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007).

17. In assessing "whether consent is voluntarily given or coercively extracted, [the court] ask[s] whether a reasonable person would believe he or she was free to disregard the officer's request under the totality of the circumstances." *United States v. Cardenas–Alatorre*, 485 F.3d 1111, 1118 (10th Cir. 2007) (quotations and citation omitted).

18. To determine whether consent was the result of coercion, the court examines a number of factors:

> the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of

>   aggressive language or tone of voice indicating that compliance
>   with an officer's request is compulsory; prolonged retention of a
>   person's personal effects such as identification and plane or bus
>   tickets; a request to accompany the officer to the station;
>   interaction in a nonpublic place or a small, enclosed place; and
>   absence of other members of the public.

*Guerrero*, 472 F.3d at 790.

19. "Although the fact that one is detained during an investigation no doubt implies an atmosphere not altogether consensual, [Tenth Circuit] precedent firmly instructs that the fact of an investigative detention, standing alone, is not so coercive as to render the consent of all detained persons involuntary." *United States v. Olivares-Campos*, 2008 WL 1930073, at *7 (10th Cir. 2008).

20. The court determines that Defendant clearly and specifically provided voluntary consent to search his home and vehicle. There is no evidence of coercion. Before Defendant consented to the searches, he was instructed by the police that he did not have to consent. *See Florida v. Rodriguez*, 469 U.S. 1, 6-7 (1984) (noting that the government "need not prove that a defendant consenting to a search knew that he had the right to withhold his consent"). In asking to search Defendant's home, Agent Holmer also informed Defendant that he could leave at any time or could ask the officers to leave at any time. *See Guerrero*, 472 F.3d at 790 ("[A]n officer is [not] required to inform a defendant explicitly that he is free to go before requesting permission to search."). Both requests for consent came in the context of a cordial conversation between Defendant and the police, in which the agents did not raise their voices, brandish their weapons, touch Defendant, or threaten Defendant.

21. The court concludes that Defendant's consent to the search of his home and vehicle was valid.

22. Under the Fifth Amendment, "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.

23. In *Miranda v. Arizona*, 384 U.S. 436 (1984), the United States Supreme Court held that "[t]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of a defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id*. at 444.

24. "It is settled that the safeguards prescribed by Miranda become applicable as soon as a suspect's freedom of action is curtailed to a degree associated with formal arrest." *Id*. at 429.

25. "[A] suspect can be placed in police 'custody' for purposes of Miranda before he has been 'arrested' in the Fourth Amendment sense." *Perdue*, 8 F.3d at 1463-64.

26. "Miranda . . . established a two-part analysis for determining when the prescribed procedural safeguards must be provided: (1) the individual must be in custody, and (2) the individual must be subjected to questioning that meets the legal definition of interrogation." *United States v. Erving L.*, 147 F.3d 1240, 1246 (10th Cir. 1998) (emphasis omitted).

27. The Court has defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action is any significant way." *Miranda*, 384 U.S. at 444.

28.   In *Rhode Island v. Innis*, 446 U.S. 291 (1993), the court explained that "interrogation includes 'any words or actions on the part of the police . . . that the police should know are likely to elicit an incriminating response.'" *United States v. Perdue*, 8 F.3d 1455, 1464 (quoting *Innis*, 446 U.S. at 301).

29.   A custody determination asks whether "'a reasonable [person] in the suspect's position would have understood his situation . . . as the functional equivalent of formal arrest.'" *United States v. Hudson*, 210 F.3d 1184, 1190 (10th Cir. 2000) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)).  A reasonable person "does not have a guilty state of mind and does not have peculiar mental or emotional conditions that are not apparent to the questioning officer." *Id*.  A custody determination requires the court to examine the totality of the circumstances. *See United States v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008).  That is, the court "consider[s] the police-citizen encounter as a whole, rather than picking some facts and ignoring others." *Id*.  Although the court avoids hard line rules, there are several non-exhaustive factors the court relies on as guidance. *See id*.  "First, [the court] consider[s] 'the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.'" *Id*. (quoting *United States v. Griffin*, 7 F.3d 1512, 1516 (10th Cir. 1993)).  "Second, [the court] look[s] at the 'nature of questioning,' where 'prolonged accusatory questioning is likely to create a coercive environment from which an individual would not feel free to leave.'" *Id*. (quoting *Griffin*, 7 F.3d at 1516).  Finally, the court determines whether the police dominated the encounter. *See id*.  To make this determination, the court relies on a number of "helpful guideposts." *Id*.  These guideposts include

>   separation of the suspect from family or colleagues who could offer moral support; isolation in nonpublic questioning rooms; threatening presence of several officers; display of weapon by an officer; physical contact with the subject; and an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled.

*Id*. (quotations, citation, and alteration omitted).

30. Based on the totality of the circumstances, including the above discussed factors, the court determines that the police took Defendant into custody for purposes of Miranda when officers removed Defendant from his vehicle at gun point, hand cuffed him, and placed him in the front seat of the police vehicle where Detective Hamideh stood beside him for approximately five to ten minutes. The court concludes that "a reasonable [person] in . . . [Defendant's] position would have understood his situation . . . as the functional equivalent of formal arrest." *United States v. Hudson*, 210 F.3d 1184, 1190 (10th Cir. 2000) (citations omitted).

31. The court determines, however, that much of the conversation between Detective Hamideh and Defendant during Defendant's stay in the front seat of the police car did not constitute interrogation. Defendant volunteered the following statements: that he ran a car business, that he had the truck in connection with his business, that he was taking the car somewhere to sell it, and that the money found in the car did not belong to him. *See Arizona v. Mauro*, 481 U.S. 520, 529 (1987) ("The fundamental import of the privilege while an individual is in custody is not whether he can be interrogated. . . . Volunteered statements of any kind are not barred by the Fifth Amendment." (alteration in original)).

32. Detective Hamideh's confirmation that the money was not Defendant's did not change the voluntary nature of Defendant's statement. *See United States v. Russell*, No. 106-CR-

15

113, 2007 WL 1768711, at *2 n.3 (D. Vt. June 15, 2007) ("[V]olunteered statements by a defendant and an officer's requests for confirmation are not 'custodial interrogations' for purposes of the Miranda doctrine."); *United States v. Banks*, No. CRIM.A.02-148, 2002 WL 1611642, at *3 (E.D. La. July 19, 2002) (holding that the officer's request for confirmation was not a custodial interrogation because "[i]t was intended to obtain a clarification and confirmation of [the] defendant's spontaneous statement"), *aff'd*, 115 Fed. Appx. 698 (5th Cir. Nov. 17, 2004).

33. As for Detective Hamideh's question to Defendant regarding the ownership of the truck, it is admissible, regardless of the lack of Miranda warnings, under the inevitable discovery exception to the exclusionary rule. *See United States v. Lara-Garcia*, 478 F.3d 1231, 1233 (10th Cir. 2007) (determining that although officer violated the defendant's Miranda rights in asking about his immigration status without a Miranda warning, the defendant's admission regarding his status was nonetheless admissible under inevitable discovery exception); *see also United States v. Long*, 705 F.2d 1259, 1262 (10th Cir. 1983) (permitting police to lawfully impound vehicle until they determine the owner of the vehicle).

34. The court does conclude that the question by Detective Hamideh to Defendant as to whether Defendant had the vehicle all day constituted interrogation and is therefore inadmissible, as is any evidence obtained as a result of this statement.

35. The court determines that any statements made by Defendant in his home to Agent Holmer did not violate Defendant's Miranda rights because Agent Holmer gave

Defendant a Miranda warning prior to asking any questions that could potentially lead to incriminating statements.

## CONCLUSION

Based on the foregoing, the court GRANTS Defendant's Motion to Suppress as to Defendant's statement—and any evidence obtained as a result of that statement—that he had control of the vehicle all day.  The court DENIES Defendant's Motion to Suppress as to all other matters.

DATED this 27th day of August, 2008.

BY THE COURT:

*(signature)*

DALE A. KIMBALL
United States District Judge